STATE v. HUNT.

(Filed April 5, 1904).

1. HOMICIDE—*Evidence—Deadly Weapon.*

> A requested instruction that if there was an opportunity to use a deadly weapon, but one was not used, it was strong evidence against premeditation, is properly modified by striking out the word "strong."

2. HOMICIDE—*Premeditation and Deliberation.*

> No particular time is necessary to constitute the premeditation and deliberation requisite to the crime of murder in the first degree.

3. HOMICIDE—*Deliberation and Premeditation.*

> Deliberation and premeditation on the part of accused on a prosecution for murder may be inferred from such circumstances as ill-will, previous difficulty between the parties and declarations of an intent to kill after or before the crime.

4. HOMICIDE—*Premeditation and Deliberation—Questions for Jury.*

> Whether there is premeditation and deliberation in a prosecution for murder is a question for the jury.

INDICTMENT against Adam Hunt, heard by *Judge O. H. Allen* and a jury, at November Term, 1903, of the Superior Court of PERSON County. From a verdict of guilty of murder in the first degree, and judgment thereon, the prisoner appealed.

> *Robert D. Gilmer, Attorney-General,* for the State.
> *W. T. Bradsher and F. O. Carver,* for the prisoner.

CLARK, C. J. The prisoner was convicted of murder in the first degree. The deceased was in charge of a store belonging to his brother, who employed the prisoner as a

saw-mill hand.   It was in evidence that the deceased had
no authority to settle with the saw-mill hands, that the de-
ceased went to the store that Saturday night and stated in
conversation with one West, about a half hour before the
homicide, that "he would have his pay or there would be
a God d——n dead nigger there that night." He left, but
returned to the store about 9 o'clock, asked for a settlement,
deceased told him he could not pay him without authority
from his brother; the prisoner commenced cursing and
stamping the floor; the deceased told him to hush, and
started around the counter with a hammer in his hand; the
prisoner jerked the hammer out of his hand and struck the
counter violently, saying "Pay me." The witness told pris-
oner he would go off and get the time-keeper to get prisoner's
time; when he returned with the time-keeper the prisoner
had deceased down, with his knees on his breast, jumping
up and down on him, and beating deceased in the face; the
time-keeper told him to "Stop, stop," whereupon the pris-
oner assaulted him, and, in the fight that followed, knocked
the time-keeper down.   The witness led the deceased to-
wards his house, thirty yards away, holding him up and
helping him along, and they were met half way by the wife
of deceased's brother crying; the prisoner then came on and
made at her, but she got home without being caught by him.
The prisoner then ran around the witness and knocked de-
ceased down; the prisoner then pulled off a strip about
twenty feet long and tried to strike the deceased—struck
trees—the deceased staggered along, half-bent, trying to get
into the house, the prisoner then ran up and struck the
deceased a heavy blow on the head knocking him down, his
head striking the porch.   Mrs. Wilkins said: "Lord, you
have killed Fleetwood." The prisoner replied: "Yes, damn
him, that is what I intended to do." The deceased fell en-
tirely unconscious.   The deceased was a weakly man, weigh-

ing about 118 pounds, and six feet tall. The prisoner was a powerful man for his size, and weighed 160 pounds or 165. The deceased died of his injuries on Thursday following.

The prisoner testified in his own behalf, contradicting the two State's witnesses who testified to his having deceased down beating him when they got there, and testified that deceased assaulted him with his knife and cut him in the back and side and he took the knife away; that Wilkins ran to his house as though to get his gun, and he hit him as he went into the porch and "knocked him against the floor of the porch"; that he (prisoner) ran against the pole and knocked it down but did not try to use it; that he hit deceased only one lick, and that was at the porch; was only trying to keep them from killing him; that he was badly cut. The wounds exhibited to the jury were a slight cut in the hand and another about one inch long on the back and a cut on nose, and some cut places on clothing were also shown, all of which prisoner said were made by deceased.

The prisoner says he followed the time-keeper, who fled out of the back door, and lost him; that then he went around the store to the front and overtook deceased as he was going into his house and struck him with his fist, and that this was the only blow he gave deceased. The medical evidence was that the teeth of deceased were crushed and his temple appeared to have been struck with a hard substance; both blows may have been made with a hammer, though they may have been inflicted with a fist. That the breast and other parts of the body of deceased showed severe contusions, and that the cuts on the prisoner were not serious. The evidence of a broken plow point found on the floor next morning was competent. It does not appear whether the point was used or not, nor does the evidence appear to have been prejudicial to the prisoner.

The prisoner, in apt time, requested the Court in writing to charge:

1. Taking the evidence offered for the State to be true, there was no evidence of a premeditated and deliberate intent to murder, and the prisoner cannot be convicted of murder in the first degree. Refused, and the prisoner excepted.

2. In no view of the case, as shown by the whole testimony, is there evidence of a premeditated and deliberate intent to kill and murder, and the prisoner cannot therefore be convicted of murder in the first degree. Refused, and the prisoner excepted.

3. If the jury shall find in this case that there was an opportunity to use a deadly weapon but that none was actually used, this circumstance should be considered as strong evidence against wilful and premeditated murder. This was given, the word "strong," however, being struck out, and the prisoner excepted to the modification.

4. If the jury shall find that it was the intention of the prisoner to do serious bodily harm to the deceased, and death ensued in consequence of injuries inflicted with such intention, then the prisoner cannot be convicted of a higher crime than murder in the second degree. This was modified and given as follows: "If the jury shall find that it was the intention of the prisoner to do serious bodily harm to the deceased, and death ensued in consequence of injuries inflicted with such intention, then the prisoner would be guilty of murder in the second degree." The prisoner excepted to the modification.

5. In the case at bar, before the prisoner can be convicted of murder in the first degree, the jury must be satisfied, beyond a reasonable doubt, from the evidence, that the prisoner killed the deceased in pursuance of a fixed and deep-rooted purpose, with cool premeditation formed in a cool state of the blood. This was given, but modified by striking

out the words "and deep-rooted" before the word "purpose" and the word "cool" before "premeditation," and the prisoner excepted. There was no exception to the charge of the Court.

We find no error in the matters excepted to. If the prisoner's own evidence is to be believed, the only blow he struck was when the deceased was entering his house and was felled to the floor of his porch; and by the prisoner's testimony there had been cooling time, for he had followed the fleeing time-keeper out of the back door and after "losing him" had gone around the store and had gone thirty yards to the home of the deceased, there being also testimony that the deceased was supported and staggering and was helped to get that far. Besides, no particular time is necessary to constitute premeditation. *State v. Norwood,* 115 N. C., 791, 44 Am. St. Rep., 498; *State v. McCormac,* 116 N. C., 1033; *State v. Covington,* 117 N. C., 834; *State v. Dowden,* 118 N. C., 1145; *State v. Foster,* 130 N. C., 666, 89 Am. St. Rep., 876.

We may mention here that in capital cases it is according to precedent and more appropriate to style the accused "the prisoner," and not "the defendant," as was done here, but we have substituted the proper word.

Whenever the circumstances attending the killing do not bring the case within the language of the statute, the State must prove deliberation and premeditation. This it may do in many ways. Ordinarly, they are not capable of direct proof but are inferable from various circumstances, such as ill-will, previous difficulty between the parties, declarations of an intent to kill after or before striking the fatal blow. *State v. Conly,* 130 N. C., 683; *State v. Covington,* 117 N. C., 861. The circumstances surrounding this homicide were sufficient to go to the jury on the question of premeditation and deliberation. Besides, assuming that some

provocation existed, the evidence shows that the killing was done in a brutal and ferocious manner, and where this is so, the killing will be attributed to a malicious disposition and not to a provocation, and the homicide will be murder. *State v. Hill,* 20 N. C., 491, 34 Am. Dec., 396; *State v. Chavis,* 80 N. C., 364; *State v. Boon,* 82 N. C., 637; *State v. Coley,* 114 N. C., 879.

No Error.